UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| OWNER-OPERATORS INDEPENDENT ) <br> DRIVERS ASSOCIATION, INC., et al., ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> MAYFLOWER TRANSIT, INC., ) <br> ) <br> *Defendant*. ) | CAUSE NO. 1:98-cv-0457-SEB-VSS <br> CAUSE NO. 1:98-cv-0458-SEB-VSS |

**ENTRY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I. *Introduction*.

This cause is before the Court on Plaintiffs' Motion for Partial Summary Judgment on the issue of whether Defendant, Mayflower Transit, Inc. ("Mayflower") may be held absolutely liable for the actions and/or alleged misconduct of its authorized agents under the federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376.12 ("Leasing Regulations"). This entry is the most recent in a long succession of previous rulings by the Court in the two companion cases, 1:98-cv-0457 and -0458, addressed jointly here.[1] The first of those rulings denied Mayflower's

---

[1] A significant portion of Mayflower's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment argues the impropriety and/or prematurity of the filing of Plaintiffs' motion, as, at the time of the filing of the motion, Mayflower's Motion to Dismiss and the Plaintiffs' Motion for Class Certification had not yet been ruled upon. Further, Mayflower's brief contains an argument to the effect that it never formally asserted as an affirmative defense that it could not be held liable for the acts of its agents. As the Court subsequently ruled upon the motions identified by Mayflower, and Mayflower has in its Amended Answer and Counterclaims formally pled the affirmative defense in dispute, the Court now notes that those arguments are

motion to dismiss.[2] The second ruling certified the class of owner-operators for purposes of this litigation and conditioned class membership upon Plaintiffs' compliance with the applicable statutes of limitations.[3] On October 8, 2002, the Court granted Plaintiffs' motion for summary judgment with respect to its claim in Cause Number 1:98-cv-0497, ruling that Mayflower's conduct as pertaining to fuel credits violated the Leasing Regulations, but denied summary judgment as to Plaintiffs' claim that Mayflower's action violated Indiana's conversion statute.[4] On December 14, 2004, the Court ruled on the parties' cross-motions for partial summary judgment on the statute of limitations issue, holding a two-year statute of limitations period applicable to Plaintiffs' federal claims and the Interstate Commerce Commission Termination Act applicable to claims arising out of contracts executed prior to 1996. The Court further ordered the parties to submit additional briefing, as part of a Supplemental Motion for Reconsideration of Class Certification, regarding the statutes of limitations applicable to the

---

moot and advises that said arguments will, therefore, not be addressed in this Entry.

[2]*Owner-Operator Independent Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, 161 F.Supp.2d 948 (S.D.Ind. 2001). The Court notes that in Mayflower's Motion to Dismiss, Mayflower raised the argument that under the applicable statutory and regulatory framework, Plaintiffs maintained no private right of action under the Leasing Regulations. The Court, in ruling upon Mayflower's motion, determined a private right of action to exist, stating: "We agree with the FHWA and with the Eighth Circuit that 49 U.S.C. § 14704(a) appears *on its face* to provide for a private right of action for damages and injunctive relief by parties injured by a carrier." *Id.* at 955. To the extent that Mayflower asserts the same argument in its briefing on the immediate motion before the Court, we decline to address that argument again in light of our previous ruling.

[3]*Owner-Operator Independent Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, 204 F.R.D. 138 (S.D.Ind. 2001).

[4]*Owner-Operator Independent Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, 227 F.Supp.2d 1014 (S.D.Ind. 2002). Additionally, the Court denied Plaintiffs' Motion for Summary Judgment on the fuel tax credits issue in Cause Number 1:98-cv-0458-SEB-VSS (formerly IP98-0458-C B/S) in a separate unpublished opinion.

contract claims and the propriety of a class action as to those claims, as well as the applicability of the Indiana conversion statute to the Plaintiffs.  On September 27, 2005, we ruled on Mayflower's Motion to Vacate the Conditional Class Certification Entry, vacating conditional class certification as to Plaintiffs' state law claims for breach of contract and conversion, while denying Mayflower's motion to vacate the conditional class certification order as to the federal claims.

In the instant motion, Plaintiffs have moved on behalf of themselves and all others similarly situated for partial summary judgment, seeking a declaration that Mayflower maintains absolute liability under the Leasing Regulations for ensuring that owner-operators, such as those included within the Plaintiff class, receive all rights and benefits as outlined in the Leasing Regulations, regardless of whether those owner-operators contracted with Mayflower directly or whether said contracts existed between the individual owner-operator and an authorized agent of Mayflower.  The motion has been fully briefed, and for the reasons stated herein, the Court **GRANTS** the Plaintiffs' Motion for Partial Summary Judgment.

II.  *Statement of Facts*.

The Court has, on several prior occasions, summarized the background facts and allegations pertinent to the two cases in which Plaintiffs seek partial summary judgment and, consequently, will not reiterate those facts here.  We note, however, that the facts as set forth in Plaintiffs' Statement of Material Facts accompanying Plaintiffs' Motion and Brief in Support of Motion for Summary Judgment remain undisputed by Mayflower.  The crux of Mayflower's argument centers on its opposition to Plaintiffs' claimed entitlement to the type of judgment sought, namely, a declaration that Mayflower can be held fully liable under the Leasing

Regulations for the acts of its agents.  Therefore, the dispute focuses on the extent to which Mayflower may be held accountable for its agents' acts or omissions.

### III.  *Discussion.*

A.  The Standard for Motion for Summary Judgment.

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  When determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the nonmoving party.  *National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*, 98 F.3d 262, 265 (7th Cir. 1996).  The court may only determine a genuine issue to exist "when a reasonable jury could find for the party opposing the motion based on the record as a whole."  *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999).  In ruling on a motion for summary judgment, the court must question "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" on any issues for which the nonmoving party bears the burden of proof at trial.  Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).  The moving party, however, may prevail by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case" and, therefore, is not required to positively disprove that case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In accordance with these standards, we construe the facts presented by the parties in the light most favorable to Mayflower, as the non-movant.

B.      The Language of Leasing Regulations and 49 C.F.R. § 376.12(m).

As an initial matter, we note that there exists no dispute regarding the material facts relevant to this motion, as the parties agree that the Department of Transportation ("DOT") has authorized Mayflower to transport property in interstate commerce, that Mayflower provides transportation services primarily via its numerous agents located nationwide, and that said agents provide transportation services in equipment leased from independent owner-operators.  There being no genuine issue of material fact for the jury to resolve, the issue to be determined for us is whether Plaintiffs are entitled to judgment as a matter of law.  In addressing that issue, the parties' arguments center upon the text of 49 C.F.R. § 376.12(m), as well as the legislative and administrative history of this regulation and the surrounding case law.  The promulgated regulation in its entirety provides:

> This paragraph applies to owners who are not agents but whose equipment is used by an agent of an authorized carrier in providing transportation on behalf of that authorized carrier.  In this situation, the authorized carrier is obligated to ensure that these owners receive all the rights and benefits due an owner under the leasing regulations, especially those set forth in paragraphs (d)-(k) of this section.  This is true regardless of whether the lease for equipment is directly between the authorized carrier and its agent rather than directly between the authorized carrier and each of these owners.  The lease between an authorized carrier and its agent shall specify this obligation.

49 C.F.R. § 376.12(m). The parties do not dispute that this regulation requires Mayflower to accept some degree of responsibility for the acts and/or omissions of its authorized agents who contract with individual owner-operators and engage in the transport of household goods.  The parties strongly disagree, however, upon the meaning of the regulation and the extent to which

5

Mayflower may be held liable for those actions by its agents that may be found to have violated the Leasing Regulations.[5] The Plaintiffs adamantly assert that the plain language of the regulation dictates that Mayflower maintains absolute liability and ultimate responsibility for ensuring that an owner-operator receives all rights and benefits provided for under the Leasing Regulations, regardless of whether the owner-operator contracted with Mayflower directly or via Mayflower's designated agent. Mayflower interprets the regulation to the contrary, arguing more specifically that the phrase "obligated to ensure" represents a more minimal responsibility imposed upon the carrier, devoid of any implication that a carrier shall be held absolutely liable or primarily responsible for monitoring its agents' actions and/or otherwise ensuring that owner-operators receive the rights and benefits to which they are entitled under the Leasing Regulations.

Seventh Circuit precedent sets forth the process we are to apply in determining the meaning of such a regulation:

> We begin our inquiry into the proper interpretation of the statute and regulation by determining whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.

See *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d. 708, 710-11 (7th Cir. 2005) (citations and internal quotation marks omitted). In examining the plain language of 49 C.F.R. § 376.12(m), the first

---

[5] Mayflower's Mem. in Opp'n to Pls.' Mot. for Partial Summ. J., p.11, stating: "In short, Mayflower does not question that carriers have a responsibility to owner-operators under the regulations. Contrary to Plaintiffs' leap in reasoning, however, this acknowledgment does not mean that Mayflower is necessarily absolutely and primarily liable for all wrongs, errors or mistakes of its agents. Rather, the parties disagree with the nature of the responsibility."

sentence clearly identifies the parties to whom the regulation pertains, to wit, "those owners who are not agents but whose equipment is used by an agent of an authorized carrier in providing transportation on behalf of that authorized carrier." Thus, this regulation clearly includes and governs the parties to these lawsuits and pertains to the leasing arrangements existing between Plaintiffs and Mayflower and/or its agents. The second sentence of the regulation imposes upon authorized carriers the obligation to protect the owners whose equipment is used by an agent of the authorized carrier by ensuring that those owners receive all rights and benefits to which they are entitled under the Leasing Regulations, especially those rights arising under subsections (d)-(k).[6] The third sentence of the regulation mandates that the authorized carrier's duty exists irrespective of whether the lease for equipment was entered into directly between the carrier and its agent or between the authorized carrier and the individual equipment owner. The final sentence of the regulation imposes a duty upon the authorized carrier and its agent to include language pertaining to the carrier's obligation within the lease itself.

  Mayflower unconvincingly contends that in reading the regulation to require an authorized carrier to have absolute or primary responsibility for ensuring the owner's receipt of all benefits and rights under the Leasing Regulations, the result is unreasonable and impractical when considering the realities that exist within the household goods transportation industry.

---

  [6]As indicated within the plain language of the regulation, the Interstate Commerce Commission ("ICC") intended to place special emphasis upon the importance of ensuring that owners receive all rights and benefits arising under 49 C.F.R § 376.12(d)-(k). Despite the emphasis placed upon the need for compliance with those particular subsections and their attendant duties under those subsections, we do not view the regulation's failure to emphasize the importance of other subsections as removing the duty placed upon carriers to comply with those subsections. Further, we note that the federal claims brought by Plaintiffs in these two actions allege violations of a number of the various subsections which place special emphasis pursuant to the plain language of the regulation.

Mayflower contends that the regulation was intended instead to accomplish two purposes: (a) to prohibit motor carriers from enacting *system-wide* policies that encourage or require its agents to violate the Leasing Regulations, and/or (b) to prohibit Mayflower from ignoring violations engaged in by its agents that result in *systematic deprivation* of owners' rights and/or benefits.[7] In attempting to find support for its position within the plain language of the regulation, however, Mayflower must rely more upon the words *excluded* from the regulation (by reading words into it that do not appear in the plain language of the statute) than those included. As a result, Mayflower posits an interpretation that, should it be accepted by this Court, would render the regulation meaningless and devoid of its essential purpose.

None of the language set out in 49 C.F.R. § 376.12(m) addresses or even hints at a specific concern regarding system-wide policies implemented by carriers or their agents and/or the systematic deprivation of an owner's rights and benefits.[8] Rather, the plain language of the regulation dictates that carriers, such as Mayflower, maintain a statutory obligation[9], regardless

---

[7]Plaintiffs contend that the alleged misconduct of Mayflower's agents in fact constitutes a systematic deprivation of owner-operators' rights and/or a system-wide violation of the leasing regulations. *See generally* Pls.' Reply to Mayflower's Mem. in Opp'n to Mot. for Partial Summ. J. at pages 3-4.

[8]Further, none of the materials (including materials pertaining to the legislative and/or administrative history of 49 C.F.R.§ 376.12(m)) submitted by Mayflower to support its opposition to Plaintiffs' motion identifies this purported concern over "system-wide" policies or "systematic deprivation."

[9]Black's Law Dictionary defines "obligation" as being either "a legal or moral duty to do or not do something" or "a formal, binding agreement or acknowledgment of a liability to pay a certain amount or do a certain thing for a particular person or set of persons." BLACK'S LAW DICTIONARY 1109 (7th ed. 2001). Under either definition, this Court finds the plain language "obligated to ensure" contained within 49 C.F.R.§ 376.12(m) to clearly impose a legal liability and/or duty upon Mayflower in regard to ensuring the receipt of the owner-operators' rights and benefits arising under the Leasing Regulations. Further, the plain language of the regulation in no way indicates that anything less than full responsibility shall be placed upon carriers in

of whether they choose to enlist an intermediary agent's services, to ensure that each individual owner entering into a lease with the carrier or the carrier's agent(s) receives <u>all</u> rights and benefits to which he is entitled under the Leasing Regulations.  The plain language of the regulation refers to the rights of all owners collectively and mandates that all owners receive that to which they are entitled under the Leasing Regulations.  The plain language does not contemplate whether the denial of an owner's rights arise via system-wide policies and procedures or through individual case-by-case circumstances.  Rather, the plain language focuses upon the central unwavering premise that the carrier must ensure that the owners receive all their rights and benefits.

  Mayflower, in reading the plain language of the regulation and contending that it is intended to require carriers to engage solely in selective policing at its own volition, imports into it a discretionary obligation on the part of the carrier that simply does not exist.  Mayflower's arguments in support of its interpretation of the regulation and its position that the regulation remains ambiguous center upon the regulation's purported failure to spell out and specifically delineate the exact nature or extent of the liability to be imposed upon the carrier or to identify the specific aspects of the Leasing Regulations that a carrier must concern itself with when monitoring the acts of its agents.  If we were to adopt Mayflower's arguments, we would have to conclude that, at the time of the regulation's promulgation, there existed an intent on the part of the ICC to bifurcate the Leasing Regulations into two distinct categories:  those regulations which the ICC deemed important enough to require oversight by the carrier in order to ensure its agents' compliance and, alternatively, those regulations which were, in essence, deemed so

---

carrying out that obligation.

trivial that a carrier could disregard them and place compliance at the discretion of its agents, without regard to whether the owner received all benefits and rights to which he was entitled under the Leasing Regulations. Mayflower's arguments are premised on its faltering efforts to identify other language that could have been included in the regulation, rather than accepting the plain language of the regulation.

As both parties point out in their respective briefs, the intent in enacting the Leasing Regulations, specifically 49 C.F.R § 376.12(m), was to clarify the obligations existing within the leasing relationships between authorized carriers and owner-operators. Further, the materials submitted by each party in support of their respective positions acknowledge that the Leasing Regulations, particularly 49 C.F.R. § 376.12(m), were created in part as an effort to protect owner-operators by fostering economic stability and to provide a more equitable division of bargaining power among the parties involved in the transport of household goods. Mayflower's implication that the promulgation of the regulation (which undoubtedly was intended to assist owner-operators in realizing the full benefit of their rights rather than detracting from their rights) merely places an obligation upon carriers to engage in "selective policing" at the carriers' own discretion leaves us unpersuaded as to any actual ambiguity in the regulation or by Mayflower's proposed interpretation of the regulation. Rather, the plain language of the regulation considered in conjunction with the entire regulatory structure of the Leasing Regulations strongly indicate to us that the regulation imposes full liability upon carriers with regard to ensuring that operator-owners receive all the rights and benefits due them under the Leasing Regulations, irrespective of whether the owner-operator entered into a lease with the carrier directly or whether said lease existed between the owner-operator and the carrier's

agent.[10]

The introduction to 49 C.F.R. § 376.12 provides: "Except as provided in the exemptions set forth in Subpart C of this part, the written lease required under § 376.11(a) shall contain the following provisions. The required lease provisions *shall be adhered to and performed by the carrier.*" (emphasis added). Thus, at the very outset of the Leasing Regulations, a carrier is required without exception to obey the regulations and perform the duties associated with said regulations. Furthermore, 49 C.F.R. § 376.12(m) expressly recognizes a loophole in the original Leasing Regulations that potentially could be abused by carriers whereby the ability of a carrier to engage in actions in violation of the regulations (e.g. denying an owner his rights and benefits) could be avoided simply by employing an agent to perform the "dirty work" for the carrier. Our conclusion does not permit Mayflower to sidestep or otherwise avoid its liability and responsibility via the loophole sought to be eliminated by 49 C.F.R. § 376.12(m).

Inasmuch as we have determined that the plain meaning of the regulation as written is unambiguous, and that the application of that plain meaning does not lead to an absurd outcome, the Court shall not question further whether the regulation's clear meaning is actually what the ICC intended to achieve. Further, because we do not find that the language of the regulation creates any ambiguity, we need not address either party's arguments based upon the legislative

---

[10]We note that Mayflower raises a myriad of arguments regarding the issue of whether a carrier can be held liable for **any and all** acts, errors, omissions or misconduct of its agents in general. For purposes of ruling upon the instant motion, however, the Court deems it unnecessary to address these concerns regarding so broad a range of potential liabilities. Instead, we have focused more narrowly upon the issue at hand by holding that the plain language of 49 C.F.R.§ 376.12(m) dictates that a carrier maintains ultimate responsibility for ensuring that owner-operators receive all rights and benefits due them under the Leasing Regulations.

and administrative history of the regulation.[11]

C.      The Scope of the ICC's Authority.

Mayflower contends that the ICC exceeded its authority in promulgating the Leasing Regulations to the extent that it intended the regulations to impose absolute liability upon authorized carriers. Mayflower asserts that "[a]lthough the ICC had broad authority to establish regulations relating to the interstate transportation of household goods, neither it nor the DOT has or had authority to impose absolute liability upon carriers where neither statute nor common law principals of agency would do so." Mayflower's Mem. at p. 20. Again, the Court finds Mayflower's argument unconvincing. We are not persuaded that no statutory basis existed for the ICC to enact 49 C.F.R.§ 376.12(m), a regulation whose plain language mandates liability on the part of the carrier. Furthermore, Mayflower provides no support for its contention that the imposition of absolute liability upon carriers violates traditional notions of common law agency principals.

Mayflower correctly states that the ICC Termination Act of 1995 ("ICCTA") extinguished the ICC itself and eliminated a portion of the statutory provisions pertaining to the regulation of the motor carrier industry. However, Mayflower takes its argument one step too far in asserting that Congress intended to create a motor carrier industry primarily free from

---

[11]*See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (noting that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," and that "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete"). *See also*, *U.S. v. Ron Pair Enterprises, Inc*., 489 U.S. 235 (1989) (noting that a court's duty in resolving a dispute over the meaning of a statute "begins where all such inquiries must begin; with the language of the statute itself" and that "it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

economic regulation. This argument lacks convincing support for the propositions that Congress intended to strip the leasing regulations currently contained within 49 C.F.R. Part 376 of their purpose and significance or that Congress never intended the ICC to possess authority to enact the Leasing Regulations, more specifically 49 C.F.R. § 376.12(m). Upon the demise of the ICC, the DOT assumed responsibility for the maintenance of motor carrier industry regulations, including but not limited to, the Leasing Regulations promulgated by the ICC. Rather than eliminating the Leasing Regulations or reducing their substantive effect, DOT maintained those regulations and delegated enforcement to the Federal Highway Administration for modification, execution and administration.[12] Even now, the Leasing Regulations remain in place, and the fact that numerous legal actions have been brought alleging violations of the regulations proves our point.

When the ICC initially proposed the addition of 49 C.F.R. § 376.12(m) (formerly § 1057(n)), it was met with a jurisdictional argument similar to that presented here by Mayflower. The ICC properly responded when it stated that "Congress has given the Commission authority to regulate the surface transportation industry and our authority to adopt reasonable leasing regulations governing the relationship between carrier and lessor has been sustained. Our decision here is a modest modification of existing rules designed to ensure simply that carriers cannot avoid the rules through the establishment of an intermediary agent." *Lease and Interchange of Vehicles (Leases Involving Carrier Agents)*, 47 Fed. Reg. 28396 (June 30, 1982).

---

[12]The regulations in dispute among the parties today, formerly know as 49 C.F.R. Part 1057, became 49 C.F.R. Part 376 in October 1996, when the DOT transferred and redesignated those regulations, among others, to the Federal Highway Administration. *See Motor Carrier Transportation; Redesignation of Regulations from the Surface Transportation Board Pursuant to the ICC Termination Act of 1995*, 61 Fed. Reg. 54706 (Oct. 21, 1996).

We have previously ruled that the statutory basis for the Leasing Regulations, 49 C.F.R. Part 376, lies within 49 U.S.C. §§ 13301 and 14102. *Owner-Operator Independent Drivers Ass'n v. Mayflower Transit, Inc.*, 161 F.Supp.2d at 954. The materials submitted to the Court in conjunction with the parties' briefing on the instant motion provide further support for the Court's determination that Congress vested in the ICC the authority to enact regulations consistent with its goals of facilitating a balanced bargaining relationship between carriers and owner-operators. Upon the dissolution of the ICC, said authority was transferred to the DOT, who in turn delegated the responsibility to the FHWA, and the Leasing Regulations, though modified in regard to numbering, remain substantively the same as when promulgated. Mayflower's inability to provide substantial, persuasive support for its position, which is, of course, contrary to our prior holding acknowledging the jurisdictional basis for the promulgation of the Leasing Regulations, prompts us to reaffirm that finding at this juncture.

*IV. Conclusion.*

For the reasons set forth above, Plaintiffs have successfully demonstrated that they are entitled to partial summary judgment establishing that Mayflower may be held absolutely liable under the federal Leasing Regulations, 49 C.F.R. Part 376, for the actions and/or alleged misconduct of its authorized agents occurring during the course of those agents' transactions with owner-operators on behalf of Mayflower. Accordingly, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** in its entirety.

ENTERED 06/01/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

**Joseph Albert Black**
THE CULLEN LAW FIRM PLLC
jab@cullenlaw.com

**James Albert Calderwood**
ZUCKERT SCOUTT & RASENBERGER
jacalderwood@zsrlaw.com

**David C. Campbell**
BINGHAM MCHALE LLP
dcampbell@binghammchale.com lcase@binghammchale.com

**David J. Carr**
ICE MILLER LLP
carr@icemiller.com ross@icemiller.com;cassie.lowry@icemiller.com

**David Aaron Cohen**
THE CULLEN LAW FIRM PLLC
dac@cullenlaw.com

**Paul Damien Cullen, Sr**
THE CULLEN LAW FIRM PLLC
pdc@cullenlaw.com

**James M. Hinshaw**
BINGHAM MCHALE LLP
jhinshaw@binghammchale.com lcase@binghammchale.com

**Martha S. Hollingsworth**
BINGHAM MCHALE, LLP
mhollingsworth@binghammchale.com cbennett@binghammchale.com

**Michael J. Morris**
THOMPSON COBURN LLP
mmorris@thompsoncoburn.com bcavins@thompsoncoburn.com

**Rebecca A. Pinto**
THOMPSON COBURN LLP
rpinto@thompsoncoburn.com

**Steven F. Pockrass**
ICE MILLER LLP
pockrass@icemiller.com mary.unger@icemiller.com

**David Wells**
THOMPSON COBURN LLP
dwells@thompsoncoburn.com srayphole@thompsoncoburn.com

**Margaret Dewey Wielenberg**
ICE MILLER LLP
margaret.wielenberg@icemiller.com janie.ross@icemiller.com